JUDGE SPRIZZO

387-07/GMV/PLS
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff Samantha International Corp.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 8675)

07 CV 7468

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAMANTHA INTERNATIONAL CORP.,

Plaintiff

- against -

SMIRNOV GROUP INCORPORATED
a/k/a OAO SMIRNOV GROUP INC.

Defendant

---

07 cv _____ ( _____ )

**VERIFIED COMPLAINT**

Plaintiff SAMANTHA INTERNATIONAL CORP. ("SAMANTHA INT'L" or "OWNERS") by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant SMIRNOV GROUP INCORPORATED a/k/a OAO SMIRNOV GROUP INC. ("SMIRNOV GROUP" or "CHARTERERS"), alleges upon information and belief as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.   At all times relevant hereto, Plaintiff SAMANTHA INT'L was and still is a foreign business entity duly organized and existing under the laws of a foreign country.

3.   At all times relevant hereto, and upon information and belief, Defendant SMIRNOV GROUP was and still is a foreign business entity organized and existing under the laws of a foreign country with a place of business at Piatnitskoe Hwy 35, entrance 2, Moscow, Russia, 125430.

4.   On or about 13 July 2007, Plaintiff, as owners of the M/V ARIETIS, entered into a maritime contract of time charter party with Defendant SMIRNOV GROUP, on a Shelltime 4 charter party form for a period of 12 months plus or minus 30 days in CHARTERERS' option. A copy of the signed charter party and additional rider clauses is attached hereto as **Exhibit 1**.

5.   Pursuant to the charter party, CHARTERERS are liable for hire at the rate of USD $24,000.00 per day to be paid 30 days in advance and for an additional USD $2,000.00 per month for telecommunication and victualling expenses ("tce"). (*See* Ex. 1: Clause 52 to rider clauses).

6.   The charter also provided that one month hire was to be remitted to OWNERS within 2 business days of the fixing of the vessel, which hire was to be kept as a guarantee by OWNERS and used as an offset for the last month hire of the charter period. (*See* Rider Clauses at page 15).

7.   OWNERS' Hire Invoice #01 in the amount of USD $713,000.00, represents the one month-hire to be paid by CHARTERERS to be held as a guarantee for the final month hire payment. Attached hereto as **Exhibit 2** is a copy of Hire Invoice #1.

8.     In accordance with the charter party, the vessel was duly tendered to CHARTERERS, and pursuant to CHARTERERS' orders, the vessel proceeded to the Suez Canal where she had to drop anchor and await for passage instructions from CHARTERERS and the nomination of Suez Canal agents by CHARTERERS. (*See* **Exhibit 3**).

9.     Pursuant to the charter party, CHARTERERS were also obligated to remit to OWNERS within five days of delivery of the vessel, one month hire along with bunker expenses. (*See* Rider Clauses at p. 15).

10.     OWNERS' Hire Invoice #2 reflects the one month hire of $713,000.00 plus bunker expenses of $570,082.00 (USD $1,283,082.00) which CHARTERERS were obligated to pay in accordance with the charter party. Attached hereto as **Exhibit 4** is a copy of Hire Invoice #2.

11.     In breach of its charter party obligations, CHARTERERS failed to pay either Hire Invoice #1 or Hire Invoice $2.

12.     Upon CHARTERERS' continued promises to pay, OWNERS granted CHARTERERS additional time to pay the invoices due and owing to OWNERS. Attached hereto as **Exhibit 5** is the exchange of communications with CHARTERERS indicating their promises to pay and the extensions granted by OWNERS.

13.     On or about August 4, 2007, a meeting was held during which CHARTERERS indicated that payment would be made within 2-3 days.

14.     Despite repeated requests and the additional time granted, CHARTERERS paid nothing.

15.    In accordance with the charter party and given CHARTERERS' breach of its obligations, OWNERS exercised their option under Clause 9(a) of the charter party and withdrew the vessel on August 7, 2007.

16.    CHARTERERS' are liable for the payment of hire at the daily rate of $24,000 from the time the vessel was delivered to them on July 13 until the date of withdrawal on August 7 (27 days x $24,000 = $648,000) and are liable for the bunkers consumed during this time period ($320,989.40). Attached hereto as **Exhibit 6** is a copy of an invoice reflecting the amount of hire and bunkers owed for the July 13 – August 7 period.

17.    OWNERS immediately commenced efforts to find substitute employment for the vessel, but have been unable to re-let the vessel as of the date of this filing. Attached hereto as **Exhibit 7** is a copy of correspondence from the vessel managers confirming that the vessel has not found substitute employment.

18.    CHARTERERS are thus liable for hire at the charter party rate of $24,000 per day from the date of withdrawal of the vessel up through the date of this filing – August 23, 2007 (16 days x $24,000 = $384,000.00) and for bunkers consumed during this time period ($96,048.00). **Exhibit 6** hereto reflects the amount of hire and bunkers owed for the August 7 – August 23 time period. Attached hereto as **Exhibit 8** is a copy of the Consumptions – Speed descriptions for the vessel which were applicable to the governing charter party and which reflect the bunkers to be consumed while the vessel is at anchorage – 10 mt/day of IFO and 3.5 MDO mt/day.

19.    Based upon information obtained from ship brokers, it is estimated by OWNERS that substitute employment for the vessel will not be found until the end of August. Attached hereto as **Exhibit 11** is a copy of the broker's advice detailing the difficulties in the market.

CHARTERERS are therefore liable for hire at the daily rate of $24,000 from August 24 until August 31 when substitute employment is expected to be found (8 days x $24,000 = $192,000).

20.    CHARTERERS are also liable for the bunkers to be consumed during this time period – a total of $48,024.00. (*See* Ex. 8 & Ex. 6).

21.    Based upon current market rates and the advices of brokers (see **Ex. 11**), OWNERS anticipate a $4,000.00 difference between the hire due under the subject charter party ($24,0000 per day) and the hire/freight to be earned on substitute employment (expected to be $20,000 per day), and CHARTERERS are liable for this difference from September 1, 2007, when substitute employment is likely to be found to July 12, 2008, when the subject charter would have terminated (10.5 months), for a total expected loss of future hire of $1,260,000.00.

22.    Based upon the foregoing, OWNERS have total claims for damages relating to CHARTERERS' non-performance as follows:  (1) hire and bunker expenses from July 13 – August 8 (when the vessel was withdrawn) in the amount of $969,989.40; (2) loss of hire and bunker expenses from the time the vessel was withdrawn until August 23, 2007, in the amount of $480,048.00; (3) loss of hire and bunker expenses from August 24, 2007, to August 31, 2007, when substitute employment is expected to be found in the amount of $240,024.00; and (4) loss of future hire in the amount of $1,260,000.00.  Attached hereto as **Exhibit 9** is s spreadsheet itemizing these amounts.

23.    The charter party provides that it is to be governed by English law and that any disputes between the parties are to be resolved by arbitration in London.

24.    OWNERS specifically reserve their right to arbitrate the substantive matters at issue and have commenced arbitration in London.

25.    This action is brought in aid of the London arbitration against CHARTERERS, to compel them to arbitrate, and to obtain security both for the claims as outlined above and for the additional sums which Plaintiff will incur in the way of anticipated attorney fees and arbitral costs in the arbitration, estimated by English solicitors at £210,000 which is USD $ 415,800.00 at the current exchange rate of 1.98, which is recoverable as part of the Plaintiff's claim under the governing English law. (Attached hereto as **Exhibit 10** is a breakdown prepared by English solicitors of the estimated costs to be incurred).

26.    This action is also brought to obtain security for interest, estimated at $353,887.35, through the completion of the arbitration (based upon 6% for 2 years), which is also recoverable as part of the Plaintiff's claim under the governing English law.

27.    Therefore, Plaintiff seeks an attachment pursuant to Rule B in the amount of USD $3,718,748.77.

28.    Upon information and belief, and after investigation, Defendant SMIRNOV GROUP cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant in the amount of $3,718,748.77 (collectively hereinafter, "ASSETS"), including but not limited to ASSETS at, moving through, or within the possession, custody or control of banking institutions including but not limited to ABN Amro, American Express Bank, Atlantic Bank, BNP Paribas, Bank of America, Citibank NA, Deutsche Bank Trust Co., HSBC, HSBC USA Bank NA, JPMorgan Chase Bank, Standard Chartered Bank, The Bank of New York, Wachovia

and/or other institutions or such other garnishees who may be served with a copy of the process of Attachment issued herein.

WHEREFORE, Plaintiff prays:

a.    That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.    That since Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of $3,718,748.77 may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant including but not limited to such assets as may be held, received or transferred in its own name or for its benefit or as may be held, received or transferred for its benefit in its name at, moving through, or within the possession, custody or control of banking institutions including but not limited to: ABN Amro, American Express Bank, Atlantic Bank, BNP Paribas, Bank of America, Citibank NA, Deutsche Bank Trust Co., HSBC, HSBC USA Bank NA, JPMorgan Chase Bank, Standard Chartered Bank, The Bank of New York, Wachovia, and/or any other garnishee(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served; and

c.    That this Court retain jurisdiction over this matter for purposes of any subsequent

enforcement action as may be necessary; and,

d.    For such other, further and different relief as this Court may deem just and proper

in the premises.

Dated: New York, New York
      August 23, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SAMANTHA INTERNATIONAL CORP

By: _____
      Gina M. Venezia (GV 1551)
      Pamela L. Schultz (PS 8675)
      80 Pine Street
      New York, NY  10005
      (212) 425-1900
      (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

GINA M. VENEZIA, being duly sworn, deposes and says as follows:

1.    I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by English solicitors representing our client.

3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Gina M. Venezia

Sworn to before me this
23 day of August 2007

_____
Notary Public

**Lisa M. Morales**
**Notary Public, State of New York**
**No. 01MO6162004**
**Qualified in the Bronx**
**Commission Expires Feb. 26, 2011**

# ORIGINAL

Code word for this Charter Party
"SHELLTIME 4"
*Issued December 1984*

# Time Charter Party
MOSCOW , 13TH JULY 2007

IT IS THIS DAY AGREED between SAMANTHA INTERNATIONAL CORP.      1
Of   PANAMA c/o EUROTANKERS INC. of AKTI MIAOULI 99, PIRAEUS, GREECE   2
(hereinafter referred to as "Owners"), being owners of the      3
good   motor tanker   vessel called ARIETIS, Panama Flag
(hereinafter referred to as "the vessel") described as per Clause 1 hereof and OAO SMIRNOV GROUP INC.    4
of   PIATNITSKOE SHOSSE 3S, MOSCOW, RUSSIA   (hereinafter referred to as "Charterers") :,    5

| | |
|---|---|
| Description and Condition of Vessel | 1. At the date of delivery of the vessel under this charter and throughout the entire period of this Charter Party,   6 she shall be classed :   7 <br>(b) she shall be in every way fit to carry crude petroleum and/or its products-; as per additional clauses 49& 50;   8 <br>(c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the   9 service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator   10 and radar) in a good and efficient state :   11 <br>(d) her tanks, valves and pipelines shall be oil-tight;   12 <br>(e) she shall be in every way fitted for burning   13 at sea - fueloil with a maximum viscosity of Centistokes at 50 degrees Centigrade/any   14 commercial grade of fueloil ("ACGFO") for main propulsion, and marine-diesel-oil/ACGFO   15 for auxiliaries   16 in port marine-diesel-oil/ACGFO for auxiliaries :   17 <br>(f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals   18 by day and night without delay :   19 <br>(g) she shall have on board all certificates, documents and equipment required from time to time by   20 any applicable law to enable her to perform the charter service without delay :   21 <br>(h) she shall comply with the description in Form B OCIMF VPQ and Questionnaire 88 to be   22 appended hereto, provided however that if there    is any conflict between the provisions of Form B the OCIMF VPQ and Questionnaire 88 and any other provision,   23 including this Clause 1, of this charter such other provision shall govern. (see additional clause 58)   24 |
| Shipboard Personnel and their Duties | 2. (a) At the date of delivery of the vessel under this charter and throughout the entire period of this Charter   25 <br>(i) she shall have a full and efficient complement of master, officers and crew for a vessel of her   26 tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be   27 trained to operate the vessel and her equipment competently and safely ; <br>(ii) all shipboard personnel shall hold valid certificates of competence in accordance with the   29 requirements of the law of the flag state :   30 <br>(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International   31 Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978 as amended from time to   32 time <br>(iv) there shall be on board sufficient personnel with a good working knowledge of the English   33 language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and    to   34 enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried   35 out quickly and efficiently.   36 <br>(b) Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew,   37 unless otherwise ordered by Charterers,   38 <br>(i) prosecute all voyages with the utmost despatch ;   39 <br>(ii) render all customary assistance , including connection/disconnection of hoses ; and   40 <br>(iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents   41 to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case   42 may be) and in each case in accordance with any applicable laws of the flag state.   43 <br>Owners shall undertake to provide throughout the entire duration of the Charter Party a crew which belongs to a Union recognized by and affiliated to ITF, or equivalent (see additional clause 62). |
| Duty to Maintain | 3. (i) Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any   44 event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the   45 conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel, as soon as   46 possible. <br>(ii) If at any time whilst the vessel is on hire under this charter the vessel or owners fail to comply with   47 their obligations under this Charter including without limitations the requirements set out in Clauses 1, 2(a) or   48 10, then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. Without prejudice to   49 the generalities of the foregoing, if and to the extent that such failure affects the time taken by the vessel to perform   50 any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of   51 the time so lost. <br>Any reduction of hire under this sub-clause (ii) shall be without prejudice to any to other remedy available to Charterers, but where such reduction of hire is in respect to time lost; such time shall be excluded from any calculation under Clause 24. <br>(iii) If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterer's reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they    are exercising such due diligence. <br>Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to   60 |



EXHIBIT

1

*Cheel* (signature)

2

terminate this charter by giving notice in writing with effect from the date on which such notice of termination is 61
received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights 62
of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights 63
under Clause 21 hereof). 64

Period Trading     4. Owners agree to let and Charterers agree to hire the vessel for a period of 12 months +/- 30 days,  see additional 65
clause 47

Limits     commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise 66
(subject always to Clause 28) including in particular dpp, crude oil and all other cargoes in accordance with 67
vessel's class, tanks, lines and vessel's pumping capability, maximum loading temp. of 165 deg fah and vessel to
maintain max heating of 135 deg fah., grades always within vessel's natural segregations, excluding bitumen
and asphalt, owners confirm the vessel has flag and class permission for trading with heavy grade oil cargoes
with S.G. upto 0.99, otherwise as per additional clauses 49&50 within Mediterranean Sea, Black Sea, Red Sea,
Arabian Gulf, East Africa, India, Singapore, Thailand, Indonesia, China, South Korea, Japan range, excluding
Iraq, Israel, Albania, TOC, North Korea, Syria, Lebanon, Somalia, Nevis Islands, Eritrea, and countries to
which the vessel cannot trade by virtue of the registration of the vessel and/or vessel's class, also UN sanctioned
countries, war or warlike areas/zones,

as Charterers shall direct, (Charterers may direct the vessel to any of that excluded countries at the same 68
conditions of the present Charter-Party with Owners' prior consent which shall not be unreasonably withheld).
subject to the limits of the current British Institute Warranties and any subsequent amendments thereof.
Notwithstanding the foregoing, but subject to Clause 35, Charterers may order the vessel to ice-bound waters or to any
part of the world outside such limits, always in accordance with additional clause 69 and provided that Owners 69
consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium 70
required by the vessel's underwriters as a consequence of such order. 71
Charterers may order the vessel to war risk areas always subject to Owners consent which shall not be 72
unreasonably withheld.

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places 73
(which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine  lines, 74
alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. 75
Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of 76
any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage 77
caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and 78
discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that 79
any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition 80
of the ICS/OCIMF Ship-to-Ship Transfer Guide. 81
    The vessel shall be delivered by Owners 82

At APS Singapore Owners' option and redelivered to Owners DLOSP at a port in Arabian Gulf – Singapore range 83
at Charterers' option. 84

Laydays/     5. The vessel shall not be delivered to Charterers before   13ᵗʰ July 2007 and Charterers shall 85
Cancelling     have the option of cancelling this charter if the vessel is not ready    and at their disposal on or before 86
16ᵗʰ July 2007

Owners to     6. Owners undertake to provide and to pay for all provisions including lubricating oils, wages, and shipping and 87
Provide     discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clause 4 and 34 88
hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water , except fresh water 89
used for tankcleaning; for all drydocking, overhaul, maintenance and repairs to the vessel ; and for all fumigation 90
expenses and de-rat certificates. Owners'       obligations under this Clause 6 extend to all liabilities for customs or 91
import duties arising at any time during the performance of this charter in relation to the personal effects of the master, 92
officers and crew, and in relation to       the stores, provisions and other matters aforesaid which Owners are to provide 93
and pay for and Owners shall       refund to Charterers any sums Charterers or their agents may have paid or been 94
compelled to pay in respect of       any such liability. Any amounts allowable in general average for wages and 95
provisions and stores shall be credited   to Charterers insofar as such amounts are in respect of a period when the vessel 96
is on-hire.

Charterers to     7. Charterers shall provide and pay for all fuel (except fuel used for domestic services), compulsory towage and 97
Provide     pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues 98
and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges, for 99
the said items shall be for Owners' account when such items are consumed, employed or incurred for Owner's purposes 100
or while the vessel is off-hire (unless such items reasonably relate to any service given or    distance made good and 101
taken into account under Clause 21 or 22) ; and provided further that any fuel used in connection with a general 102
average sacrifice or expenditure shall be paid for by Owners. 103

Rate of     8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of 104
Hire     see additional clause 52 per day, and pro rata for any part of a day, from the time and date of her delivery (local 105
time) until the time and date of her redelivery (local time) to Owners. 106

Payment of     9. Subject to Clause 3(iii), payment of hire shall be made in immediately available funds to : 107
For Owners' bank details – see additional clause 52

Hire

    Account 108
in     USD     per calendar month in advance, less : 109
(i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and 110
(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and       charges 111
which are for Owners' account pursuant to any provision hereof, and 112
(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or 113

*Chuck* (signature)

24 hereof,

any such adjustments to be made at the due date for the next monthly payment after the facts have been  ascertained.   114
Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners'  account provided   115
that Charterers have made proper and timely payment.   116
117
    In default of such proper and timely payment.   118
    (a) Owners shall notify Charterers of such default and Charterers shall within 3 (three) banking days of receipt of   119
such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the   120
service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise ;  and   121
122

    ~~(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date————up~~   123
~~to and including the day when payment is made, at a rate per annum which shall be 1 % above the U.S. Prime Interest~~   124
~~Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date,————or, if no~~   125
~~such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate~~   126
~~was so published, computed on the basis of a 360 day year of twelve 30 day months, compounded———semi-annually.~~   127
128

**Space**
**Available to**
**Charterers**
    10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including   129
Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master,   130
officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall  not,   131
unless specially agreed, exceed 250 tonnes, ~~consisting of but not limited to ship-to-ship transfer equipment such as~~   132
~~fenders and cargoes,~~ at any time during the charter period.

**Overtime**
    11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for ~~Charterers'~~ Owners   133
account – see additional clause 52 (hire) ~~when incurred, as a result of complying with the request of Charterers or~~   134
~~their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning.~~   135

**Instructions**
**and Logs**
    12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and   136
he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required.   137
The master shall when required furnish Charterers or their agents with a true copy of such log and with properly   138
completed loading and discharging ports sheets and voyage reports for each voyage and other returns as Charterers   139
may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not   140
provided by the master. Reports to be completed in English.   141

**Bills of**
**Lading**
    13. (a) The master (although appointed by Owners) shall be under the orders and direction of   142
Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as   143
Charterers or their agents may direct (subject always to Clause 35(a) and 40) without prejudice to this charter.   144
Charterers hereby indemnify Owners against all consequences or liabilities that may arise.   145
        (i) from signing bills of lading in accordance with the directions of Charterers or their agents, to   146
the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as   147
provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders :   148
        (ii) from any irregularities in papers supplied by Charterers or their agents.   149
    (b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from   150
Charterers to discharge all or part of the cargo.   151
        (i) at any place other than that shown on the bill of lading and/or   152
        (ii) without presentation of an original bill of lading   153
    unless they have received from Charterers both written confirmation of such orders and an   154
indemnity in a form acceptable to Owners - see Appendix 2.   155

**Conduct of**
**Vessel's**
**Personnel**
    14. If Charterers complain of the conduct of the master or any of the officers or crew, Owner shall   156
immediately investigate the complaint. If the Complaint proves to be well founded, Owners shall, without delay, make   157
a change in the appointments and Owners shall in any event communicate the result of their investigations  to   158
Charterers as soon as possible.   159

**Bunkers at**
**Delivery and**
**Redelivery**
    15. ~~Charterers shall accept and pay for all bunkers on board at time of delivery, and Owners shall on~~   160
~~redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and~~   161
~~pay for all bunkers remaining on board, as the case may be, or if such prices are not available payment shall be at the~~   162
~~then current market prices at the  nearest port at which such prices are available ; provided that if delivery or~~   163
~~redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before~~   164
~~delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they~~   165
~~may have in force from time to time, if so required by Charterers, provided suppliers agree.~~ Vessel to be redelivered   166
with the same amount of bunkers as on delivery, prices for delivery/redelivery as per last bunker invoices.   167

**Stevedores,**
**Pilots, Tugs**
    16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners   168
from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict   169
account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents  against   170
all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots,   171
tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service   172
of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact  the servants of   173
Charterers their agents or any affiliated company) ; provided, however, that   174
        (i) the foregoing indemnity shall not exceed the amount to which Owners would have been  entitled   175
to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and   176
        (ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of  stevedores,   177
fair wear and tear excepted, to the extent that Owners are unable to obtain redress by the exercise of due diligence to  obtain redress   178
therefore from stevedores.   179

**Supernumeraries**
    17. Charterers may send representatives in the vessel's available accommodation upon any voyage made   180
under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers   181
paying at the rate of  20 USD per day for each representative while on board the vessel.   182

**Sub-letting**
    18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this   183

4

charter.                                                                                                    184

**Final Voyage**    19. If when a payment of hire is due hereunder Charterers reasonably except to redeliver the vessel before the next    185
payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time    186
necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct    187
amounts due or reasonably expected to become due for                                                        188
    (i) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and    189
    (ii) bunkers on board at redelivery pursuant to Clause 15.                                    190
                                                                                                            191
    Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by    192
Charterers.                                                                                                  193
    If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a    194
ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel    195
at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or    to    196
complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.    197

**Loss of**    20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should    198
**Vessel**    the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the    199
vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall    200
terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not    201
earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of    202
bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.    203
                                                                                                            204

**Off-hire**    21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service    205
of, from reduction in the vessel's performance, or in any other manner).                                     206
    (i) due to deficiency of personnel or stores ; repairs ; gas-freeing for repairs ; time in and waiting  to enter    207
dry dock for repairs ; breakdown (whether partial or total) of machinery, boilers or other parts of the  vessel or her    208
equipment (including without limitation tank coatings) ; overhaul, maintenance or survey ; time lost by the vessel for    209
obtaining all necessary authorisations and certificates, if any, linked to the vessel for trading; collision, standing,    210
accident or damage to the vessel ; or any other similar cause preventing the efficient working of the vessel ; and such    211
loss continues for more than, three consecutive hours (if resulting from interruption in the vessel's service) or    212
cumulates to more than three hours (if resulting from partial loss of service) ; or                          
    (ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the    213
master, officers or crew ; or                                                                                214
    (iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured    215
person (other than a Charterers' representative carried under Clause 17 hereof) or landing stowaways, stores,    216
provisions or changing crew, or for the purpose of landing the body of any person (other than a Charterers'    217
representative), and such loss continues for more than three consecutive hours : or                          218
    (iv) due to any delay in quarantine arising from the master, officers or crew having had  communication    219
with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any    220
detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the    221
master, officers, or crew ; or                                                                              222
    (v) due to detention of the vessel by authorities at home or abroad attributable to legal action    223
against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or    224
neglect of Charterers) ;                                                                                     225
    without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers    hereunder    226
or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an    227
efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of    228
time commenced ; provided, however, that any service given or distance made good by the    vessel whilst off-hire    229
shall be taken into account in assessing the amount to be deducted from hire.                                230
    (b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure    arises    231
wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel  shall be    232
off-hire under this Clause 21 shall be the difference between                                                233
    (i) the time the vessel would have required to perform the relevant service at such guaranteed    234
speed, and                                                                                                  235
    (ii) the time actually taken to perform such service (including any loss of time arising from    236
interruption in the performance of such service).                                                           237
    For the avoidance of doubt, all time included under (ii) above shall be excluded from any    238
computation under Clause 24.                                                                                 239
    (c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which    expression    240
includes without limitation putting back, or putting into any port other than that to which she is bound under the    241
instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be    off-hire from    242
the commencement of such deviation until the time when she is again ready and in an efficient state    to resume her    243
service from a position not less favourable to Charterers than that at which the deviation    commenced, provided,    244
however, that any service given or distance made good by the vessel whilst so off-hire    shall be taken into account    245
in assessing the amount to be deducted from hire. If the vessel, for any cause or    purpose mentioned in Clause 21(a),    246
puts into any port other than the port to which she is bound on the    instructions of Charterers, the port charges,    247
pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or    248
anchorage by stress of weather hire shall continue to be due and  payable during any time lost thereby.    249
    (d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such    hostilities    250
find it commercially impracticable to employ the vessel and have given Owners written notice thereof  then from the    251
date of receipt by Owners of such notice until the termination of such commercial impracticability  the vessel shall    252
be off-hire and Owners shall have the right to employ the vessel on their own account.                       253
    ~~(e) Time during which the vessel is off-hire under this charter shall count as part of the charter~~    254
~~period.~~                                                                                                  255
    (e) Charterers shall have the option, at the end of the charter period, to extend the Charter-    256
Party period for all or any part of the time the vessel has been off-hire under the charter period.
Charterers to declare such option 45 days prior to the contractual redelivery date.

**Periodical**    22. (a) Owners  have the right and  obligation to drydock  the  vessel at regular intervals of    257

5

**Drydocking**

30 months

On each occasion Owners shall propose to Charterers a date on which they wish to | 258
drydock the vessel, not less than 30 days before such date, and Charterers shall offer a port for such periodical | 259
drydocking within the trading area and shall take all reasonable steps to make the vessel available as near to such | 260
date as practicable. | 261

   Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel | 262
at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for | 263
the disposal into reception facilities of such tank washings and residues and shall have   the right to retain any monies | 264
received therefore, without prejudice to any claim for loss of cargo under any bill of lading or this charter. | 265
| 266

   (b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable | 267
accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire | 268
from the time she arrives at such port until drydocking is completed and she is in every way ready to resume | 269
Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, | 270
whichever she first attains. However, | 271

   (i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to | 272
the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether  lost | 273
on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and | 274

   (ii) any additional time lost in further gas-freeing to meet the standard required for hot work or  entry to | 275
cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. | 276

   Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation | 277
under Clause 24. | 278

   The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners' | 279
account. | 280

   (c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical  drydocking at a | 281
special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special | 282
port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers | 283
shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not | 284
proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value | 285
of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for | 286
the service speed, and shall further credit Owners with any  benefit they may gain in purchasing bunkers at the special | 287
port. | 288

   (d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning | 289
necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to | 290
have been saved thereby, whether the vessel drydocks at an offered or a special port. | 291

**Ship Inspection**

23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they | 292
may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute | 293
discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation | 294
and accommodation on board provided, however, | 295

   (i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise    or | 296
non-exercise, by Charterers of such right shall in any way reduce the master's or Owner's authority over, or | 297
responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase    Charterers' | 298
responsibilities to Owners or third parties for the same ; and | 299

   (ii) that Charterers shall not be liable for any act, neglect or default by themselves, their    servants | 300
or agents in the exercise or non-exercise of the aforesaid right. | 301

**Detailed**

24. (a) Owners guarantee that the speed and consumption of the vessel shall be as follows throughout the entire | 302
period of the present Time-Charter Party:

**Description and Performance**

As per Q88 and time charter description given by Owners (herewith attached) | 303
| 304

| 306

| 307

   The foregoing bunker consumptions are for all purposes except cargo heating, reinerting, ballasting and | 308
deballasting, cargo operation and tank cleaning    and shall be pro-rated between the speeds shown. | 309

   The service speed of the vessel is  12.0  knots laden and 12.5 knots in ballast and in the absence    of | 310
Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one  laden and | 311
one ballast speed are shown in the table above Charterers shall have the right to order the vessel to  steam at any speed | 312
within the range set out in the table (the "ordered speed"). | 313

   ~~If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average~~ | 314
~~speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the~~ | 315
~~"maximum recognised speed"), then for the purpose of calculating any increase or   decrease of hire under this~~ | 316
~~Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained.~~ | 317

   For the purposes of this charter the "guaranteed speed" at any time shall be the then-current  ordered speed | 318
or the service speed, as the case may be. | 319

   The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by | 320
reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in | 321
Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) (i) would be) off-hire and also | 322

6

excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in 323
congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force 8 5 on the Beaufort Scale 324
for more than 12 hours 325
326

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls 327
below the performance guaranteed in Clause 24(a) then if such shortfall results. If at any time following the date 328
upon which the vessel enters into service under this charter the performance of the vessel falls below the 329
performance guaranteed in Clause 24 (a) as amended then if such shortfall results. 330

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed     guaranteed 330
in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, 331
shall be deducted from or added to the hire paid; 332

(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which 333
would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value 334
of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by 335
Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. 336

The addition to or deduction from hire so calculated for laden and ballast mileage respectively  shall be 337
adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing 338
such addition or deduction by the number of miles over which the performance has been calculated and multiplying by 339
the same number of miles plus the miles steamed during the Adverse Weather  Periods, in order to establish the total 340
addition to or deduction from hire to be made for such period. 341

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy 342
available to Charterers. 343

(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive 344
anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the 345
date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause 346
during the final year or part year of the charter period shall in the first instance be settled in accordance with 347
Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter 348
terminates shall be made by payment by Owners to Charterers or by Charterers to  Owners as the case may require. 349

350

Payments in respect of increase of hire arising under this Clause shall be made promptly after ————— receipt by 351
Charterers of all the information necessary to calculate such increase. Over-performance not to be claimed by the 352
owner's.

**Salvage**  25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to     or 353
loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in  successful or 354
unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be 355
liable to contribute towards any salvage payable by Owners arising in any way out of  services rendered under this 356
Clause 25. 357

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers  after 358
deducting the master's, officers' and crew's share. 359

**Lien**  26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts     due 360
under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not    earned, and 361
for all claims for damages arising from any breach by Owners of this charter. 362

**Exceptions**  27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided,  be liable for 363
any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, 364
mariners or other servants of Owners in the navigation or management of the vessel ; fire, unless caused by the actual 365
fault or privity of Owners ; collision or stranding ; dangers and accidents of the sea ; explosion, bursting of boilers, 366
breakage of shafts or any latent defect in hull, equipment or machinery ; provided, however, that Clauses 1, 2, 3 and 24 367
hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, 368
unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance 369
hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, 370
lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people. 371

372

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress 373
and to deviate for the purpose of saving life or property. 374

(c) Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in 375
respect of 376

(i) loss or damage caused to any berth, jetty, docks, dolphin, buoy, mooring line, pipe or crane  or other 377
works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not 378
such works or equipment belong to Charterers, or 379

(ii) any claim (whether  brought by Charterers or any other person) arising out of any loss of or  damage to 380
or in connection with cargo. Any All such claims shall be subject to the Hague Rules or the Hague-Visby Rules or the 381
Hamburg rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the 382
relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the 383
Hague-Visby Rules unless the Hamburg rules compulsorily apply in which case to the Hamburg rules. 384

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in 385
any way affect any provision in this charter relating to off-hire or to reduction of hire. 386

**Injurious**  28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing 387
**Cargoes**  any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be 388
for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that  would expose the vessel 389
to capture or seizure by rulers or governments. 390

**Grade of**  29. Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of  380  Centistokes RMG 35 as 391
**Bunkers**  per ISO 8217/96 at 50 degrees Centigrade/ACGFO for main propulsion and  diesel oil/ACGFO for the auxiliaries. If 392
Owners require the vessel to be supplied with more expensive bunkers then they shall be liable for the extra cost thereof. 393
Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying 394



7

with the International Marine Bunker Supply Terms and Conditions of ~~Shell International Trading Company~~ and with its specification for marine fuels as amended from time to time.   395
                                                                      396

**Disbursements**   ~~30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents          shall~~   397
~~make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and~~   398
~~all such advances and commission shall be deducted from hire.~~   399

**Laying-up**   31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel   400
always afloat at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be   401
adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should          reasonably   402
be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the   403
charter period.   404

**Requisition**   32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the   405
vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such   406
requisition period shall be for Owners' account. Any such requisition period shall count as part of  the charter period.   407
                                                                      408

**Outbreak of War**   33. If war or hostilities break out between any two or more of the following countries: U.S.A., ~~U.S.S.R.~~, CIS/   409
Russia, any EU country, Switzerland, ~~UK, Netherlands~~ both Owners and Charterers shall have the right to cancel   410
this charter. However, neither party shall be entitled to terminate this charter party on account of minor and/or
local war like operations or economic warfare anywhere which will not interfere with vessel's trade.

**Additional War Expenses**   34. See additional clause 73 ~~If the vessel is ordered to trade in areas where there is war (de facto or de jure) or~~   411
~~threat of war,  Charterers shall reimburse Owners for any additional insurance premia, crew bonuses  and other~~   412
~~expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are~~   413
~~given notice of  such expenses as soon as practicable and in any event before such expenses are incurred, and~~   414
~~provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect~~   415
~~of any  claims by Owners under their own war risk insurance arising out of compliance with such orders. Charterer is~~   416
~~under no circumstances whatsoever to be liable for any loss, damage or expense which is, or could be, covered~~
~~by war risks insurance available commercially.~~

**War Risks**   35.See additional clause 74 ~~(a) The master shall not be required or bound to sign bills of lading for any place~~   417
~~which in his or         Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to~~   418
~~any blockade,     war, hostilities, warlike operations, civil war, civil commotions or revolutions.~~   419
~~(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in~~   420
~~Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach    or~~   421
~~enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter    (a~~   422
~~"place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and~~   423
~~Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be landed or~~   424
~~discharged, as the case may be, at any other place within the trading limits of this charter (provided such other    place~~   425
~~is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received~~   426
~~from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to~~   427
~~discharge the cargo or such part of it as may be affected at any place which they or the master may in    their or his~~   428
~~discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of~~   429
~~Owners' obligations under this charter so far as cargo so discharged is concerned.~~   430
~~(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival,~~   431
~~routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever  given by the~~   432
~~government of the state under whose flag the vessel sails or any other government or local authority or by any person~~   433
~~or body acting or purporting to act as or with the authority of any such government or local  authority including any de~~   434
~~facto government or local authority or by any person or body acting or purporting to  act as or with the authority of~~   435
~~any such government or local authority or by any committee or person having under  the terms of the war risks~~   436
~~insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with~~   437
~~any such directions or recommendations anything is done or is not done, such    shall not be deemed a deviation.~~   438
~~If by reason of or in compliance with any such direction or recommendation the vessel does not  proceed to any~~   439
~~place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed  to any place which~~   440
~~the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected.~~   441
~~Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so~~   442
~~discharged is concerned.~~   443
~~Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping~~   444
~~War Risks Clause 1952.~~   445
                                                                      446

**Both to Blame Collision Clause**   36. If the liability for any collision in which the vessel is involved while performing this charter falls to be   447
determined in accordance with the laws of the United States of America, the following provision shall apply :   448
"If the ship comes into collision with another ships as a result of the negligence of the other ship and any   act,   449
neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of   450
the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or   451
non-carrying ship or her owners in so far as such loss or liability represents loss of, or   damage to, or any claim   452
whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying  ship or her owners to the   453
owners of the said cargo set off, recouped or recovered by the other or non-carrying ship or her owners as part of   454
their claim against the carrying ship or carrier".   455
"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship       or   456
ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or   457
contact."   458
Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the   459
foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be   460
determined in accordance with the laws of the United States of America.   461

**New Jason Clause**   37. General average contributions shall be payable according to the York/Antwerp Rules, ~~1974~~,1994 as amended   462
from time to time, and shall be adjusted in London in accordance with English law and practice but should   463
adjustment be made in accordance with the law and practice of the United States of America, the following provision   464

8

shall apply :

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting 465
from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is 466
not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute 467
with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that 468
may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo." 469

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship 470
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover   the estimated 471
contribution of the cargo and any salvage and special charges thereon shall, if required, be made by  the cargo, 472
shippers, consignees or owners of the cargo to the carrier before delivery." 473

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 474
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and 475
practice of the United States of America. 476
477

**REVISED Clause Paramount**      38. Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the      following 478
clause : 479

"(1) Subject to sub-clause (2) or (3) hereof, this bill of lading shall be governed by, and have effect subject 480
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of   Lading 481
signed at Brussels on 25th August 1924 (hereafter the "Hagues Rules") as amended by the Protocol signed     at 482
Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be     deemed to 483
be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or 484
liabilities under the Hague-Visby Rules." 485

"(2) If there is governing legislation which applies the Hague Rules Compulsorily to this bill of lading,     to the 486
exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. Nothing 487
herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities     or an 488
increase of any of his responsibilities or liabilities under the Hague Rules. 489

" 3) if there is governing legislation which applies the Hamburg Rules compulsorily to this Bill of Lading, to the · 490
exclusion of the Hague Visby rules, then this Bill of Lading shall have effect to the Hamburg rules. Nothing herein 491
contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of 492
any of his responsibilities or liabilities under the Hamburg rules. 493

"(3) (4) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules or Hamburg rules if 494(?)
applicable, such term shall be void to that extent but not further."

"(4) (5) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving        the
right of any relevant party or person to limit his liability under any available legislation and/or law".

**TOVALOP**      ~~39. Owners warrant that the vessel is:~~ 494
~~(i) a tanker in TOVALOP~~ 495
~~(ii) properly entered in                                                                                          P & I Club~~ 496

~~and will so remain during the currency of this charter.~~ 497
~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or~~ 498
~~when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the     escape or discharge~~ 499
~~of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or        not an escape or~~ 500
~~discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to        Owners or master,~~ 501
~~undertake such measures as are reasonably necessary to prevent or minimise such Pollution Damage or to remove the~~ 502
~~Threat, unless Owners promptly undertake the same. Charterers shall keep Owners  advised of the nature and result of~~ 503
~~any such measures taken by them and, if time permits, the nature of the  measures intended to be taken by them.~~ 504
~~Any of the aforementioned measures taken by Charterers shall be        deemed taken on Owners' authority as  Owners'~~ 505
~~agent, and shall be at Owners' expense except to the extent  that:~~ 506
~~(1) any such escape or discharge or Threat was caused or contributed to by Charterers, or~~ 507
~~(2) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International        Convention on Civil~~ 508
~~Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to~~ 509
~~the Threat, would have been exempt from liability for the same, or~~ 510
~~(3) the cost of such measures together with all other liabilities, costs and expenses of Owners arising   out of or in~~ 511
~~connection with such escape or discharge or Threat exceeds one hundred and sixty United States  Dollars (US $160)~~ 512
~~per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States   Dollars (US $16,800,000),~~ 513
~~whichever is the lesser, save and insofar as Owners should be entitled to recover such  excess under either the 1971~~ 514
~~International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or~~ 515
~~under CRISTAL ;~~ 516
~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures     should be~~ 517
~~discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to      continue said~~ 518
~~measures under the provisions of this Clause 39 and all further liability to Charterers under this   Clause 39 shall~~ 519
~~thereupon cease.~~ 520
~~The above provisions are not in derogation of such other rights as Charterers or Owners may have under this charter~~ 521
~~or may otherwise have or acquire by law or any International Convention or TOVALOP.~~ 522
~~The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability    for Oil Pollution~~ 523
~~dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the  Contract Regarding an~~ 524
~~Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as amended from time to time. The~~ 525
~~terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this Clause 39 have the meanings ascribed~~ 526
~~to them in TOVALOP. (see additional clause 49 and 55)~~ 527

See additional clauses 71 and 72

**Export Restrictions**      40. The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to    which 528
export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced 529
and/or shipped. 530

Charterers shall procure that all bills of lading issued under this charter shall contain the following      clause 531
:                                                                                                                  532

"If any laws rules or regulation applied by the government of the country in which the cargo was       produced 533

9

and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo          to the place          534
of discharge designated in or ordered under this bill of lading, carriers shall be entitled to          require cargo          535
owners forthwith to nominate an alternative discharge place for the discharge of the          cargo, or such part          536
of it as may be affected, which alternative place shall not be subject to the          prohibition, and carriers shall          537
Be entitled to accept orders from cargo owners to proceed to and          discharge at such alternative place. If          538
cargo owners fail to nominate an alternative place within 72          hours after they or their agents have          539
received from carriers notice of such prohibition, carriers shall          at liberty to discharge the cargo or          540
such part of it as may be affected by the prohibition at any safe place          on which they or the master may in          541
their or his absolute discretion decide and which is not subject to the prohibition, and such discharge constitute          542
due performance of the contract contained in this bill          of lading so far as the cargo so discharged          543
is concerned".          544

     The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading          being          545
deemed to be references to this charter.          546

**Law and Litigation**

    41. (a) This charter shall be construed and the relations between the parties determined in accordance          547
with the laws of England.          548

    (b) Any dispute arising under this charter shall be decided by the English High Courts in London to whose          549
jurisdiction the parties hereby agree.          550

    (c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain          the          551
arrest of any maritime property, either party may, by giving written notice of election to the other party, elect          to          552
have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the          provisions of          553
the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being          in force.          554
    555

     (i) A party shall lose its right to make such an election only if :          556
      (a) it receives from the other party a written notice of dispute which -          557
        (1) states expressly that a dispute has arisen out of this charter ;          558
        (2) specifies the nature of the dispute ; and          559
        (3) refers expressly to this clause 41(c)          560
      and          561
      (b) it fails to give notice of election to have the dispute referred to arbitration not later than          562
        30 days from the date of receipt of such notice of dispute.          563
     (ii) The parties hereby agree that either party may -          564
      (a) appeal to the High Court on any question of law arising out of an award ;          565
      (b) apply to the High Court for an order that the arbitrator state the reasons for his award ;          566
      (c) give notice to the arbitrator that a reasoned award is required ; and          567
      (d) apply to the High Court to determine any question of law arising in the course of the          568
        reference          568

    (d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in          which          570
maritime property has been, or may be, arrested in connection with a dispute under this charter, that that          party          571
furnishes to the other party security to which that other party would have been entitled in such legal  proceedings in the          572
absence of a stay. For smaller disputes upto US$ 50 000 the small claim procedure laid down by the London Maritime          573
Arbitrations' Association and any subsequent amendment thereto shall apply.

**Construction**

    42. The side headings have been included in this charter for convenience of reference and shall in no way affect          574
the construction hereof.          575

       Rider to the Charter Party (additional clauses 43 to 90), Appendix No.1 (OCIMF VPQ and Questionnaire 88), and Appendix No.2 (LOI wordings) as herewith attached are deemed to be incorporated in and to form an integral part of this Charter Party.





*THE CHARTERERS*

# ORIGINAL

| Rider to Time Charter Party dated 13.07.2007 |
| :---: |
| m/t ARIETIS / Smirnov Group Inc. |

### 43. PRIVACY

All negotiations and fixture to be kept strictly private and confidential by all parties and shall not be reported or disclosed to any third party except parties' lawyers and/or bankers.

### 44. SBT

Owners warrant the Vessel has sufficent segregated ballast tanks as per Marpol regulations and is capable of ballasting/deballasting while performing cargo operations, shore facilities permitting. If Vessel fails to perform above operations in the same time, due to vessel's problems extra time used for ballasting/deballasting will count as off-hire and bunker consumed shall be for Owners' account.

### 45. ARAB LEAGUE / LYBIAN CERTIFICATE

Owners warrant that to the best of their knowledge at the time of delivery into service under this charter party the Vessel is not blacklisted by Arab Boycott League.

If required for calls to Libya, ~~Owners~~ Charterers shall arrange for Vessel's certificates to be translated into Arabic language for their risk, time and expense.

### 46. WATCHMEN / GARBAGE DISPOSAL

Gangway watchmen and fire watchmen shall be for Owners account unless compulsory in which case for Charterers account. Galley and accommodation garbage disposal, compulsory or not, always for Owners account.

### 47. CHARTER PERIOD

Duration of the present Charter Party : 12  months, plus or minus 30 days in Charterers' option plus any optional off hire period pursuant to Clause 21(e) , such options to be declared latest 45 ~~15~~ days prior to expiration of the relevant period.

### 48. EXTENSION OF CHARTER PERIOD

Further to Clauses 4 of SHELLTIME 4 and 47 (additional clauses), Charterers shall have the option to extend the present Charter Party at the expiration of the firm period (as defined in Clause 47) by a period of 12 months plus or minus 30 days , at Charterers' option, such extension to be declared by Charterers to Owners latest 45 ~~15~~ days prior to expiration of the relevant period.

Off-hire extensions to be subject to the Clause 21 (e) in any case.

### 49. CARGOES

Owners warrant that the Vessel shall be in every way fit to carry crude oil, ~~clean and~~ dirty petroleum products, ~~ore-emulsion,~~ carbon black feedstock as well as other cargoes in accordance with cargo tank coating resistance list, Vessel's Certificate of Fitness or NLS Certificate. Owners shall promptly attend to Charterers' request for inclusion of additional cargoes, as may be required by Charterers' trade, into Vessel's Certificate of Fitness or NLS Certificate.

## ~~50. MULTIGRADE TRADE~~

~~Owners warrant that on the date of commencement and throughout the duration of this Charter the Vessel shall be in every way fit to load/carry/discharge multiple grades of cargoes in accordance with ISGOTT requirements and Charterers' cargo handling instructions.~~

~~It is clearly understood between Charterers/Owners that all loading/discharging instructions etc. received from Charterers are to be carefully analyzed by Master/officers and if Master/officers have any objections to instructions received, Master is to contact Charterers immediately in order to clarify orders received.~~

~~The Owners shall exercise due diligence to maintain in good condition all parts and surfaces coming in contact with the cargoes and shall repair at first opportunity all cracks, defects and damages to the coating, bulkheads, cargo pipes and other cargo handling / servicing equipment, including normal wear and tear, as much as can be recognized/determined.~~

~~Charterers have the option to share the same pumps/lines in order to accommodate grades outside vessel's natural segregations, but the loading/discharging sequence of the grades is always subject only to vessel's safety and stability. If requested locally, Master will blow the line between grades when the same line is used to discharge more than 1 (one) grade.~~

~~From the date of delivery and throughout the duration of this Charter Master/Owners shall keep accurate records of cargo history, including MTBE/ETBE content. Upon request from Charterers Master shall promptly provide the latter with cargo history statement showing last 3 cargoes in all tanks, including slop tanks.~~

## 51. PUMPING

a)  Owners warrant that throughout the entire period of the charter party the Vessel will be able to discharge the entire homogenous cargo within 24 hours , excluding stripping, or pro rata thereof in respect of a part cargo, from the commencement of pumping or that the Vessel shall maintain her maximum discharge pressure at each vessel's manifold ( which owners warrant shall never be less than average 100 PSI at each vessel's manifold  provided that shore facilities are capable of the same and the shore instructions permit.

The Vessel will throughout the entire duration of the Charter be equipped with pressure gauges at each discharge manifold, which will be calibrated and maintained in a proper wording condition and each gauge shall have a valid test certificate. In case of transhipment operations, the discharging rate is to be agreed between the masters of the supplying and receiving vessels.

b)  Owners warrant that they shall instruct Master:

i)  to clarify by letter of protest and remarks on the time sheet, countersigned by receivers/terminal representatives when possible, wherever pumping time exceeds warranted period and/or wherever the Vessel does not maintain the minimum warranted discharge pressure and/or wherever the terminal requires discharging of grades consecutively, and/or wherever the Vessel does not maintain her maximum discharge pressure, and



ii)    to keep an hourly record (countersigned by receivers/terminal representatives when possible) of the pumping pressure and flow rate at the Vessel's manifold(s).

iii)   should receivers/terminal representatives signatures not be possible to obtain to issue relevant letter of protest via agents

c)  The Vessel will throughout the entire period of the Charter be able to load/discharge  minimum two grades simultaneously.

d)  Should any delays be caused due to Owners breach of any of the provisions of this clause, Charterers shall have the right to withhold hire to the extent necessary to indemnify Charterers for any such breach.


## 52. HIRE

The rate of hire to be USD 24,000.00 per day, inclusive of overtime, ~~communication and representation~~. additionally USD 2,000.00 lumpsum per month for telecommunication and victualling expenses.
Hire shall be paid 30 days ~~monthly~~ in advance to Owners bank account as follows:

National Bank of Greece
Branch 196
2, Bouboulinas Str., & Akti Miaouli
Piraeus 185 35, Greece
Swift: ETHNGRAA
via  : Bank of New York swift IRVTUS3N or
        J.P.Morgan Chase swift CHASUS33
Account number: 196-931882-86
IBAN: GR 070 110 196 20000 196 931882 86
Beneficiary: Eurotankers Inc.


## 53. DELIVERY/REDELIVERY NOTICES

~~Owners shall give Charterers 20/10 days prior notice of delivery (approximated place of delivery) and 3/2/1 days prior firm delivery notice of the vessel (date and place of delivery specified).~~

~~Charterers shall give Owners 20/10 days prior notice of redelivery (approximated place of redelivery) and 3/2/1 days prior firm delivery notice of the vessel (date and place of redelivery specified).~~

30/20/15 days preliminary and 10/7/5/3/1 definitive notices of redelivery by Charterers.


## 54. TELEFAX / TELEX / EMAIL

Owners warrant that as from the date of delivery into this Charter the Vessel shall be equipped with a recent and efficient communication systems allowing reliable telephone, telefax, telex and email communications with the Vessel which Owners shall maintain in good working order throughout the entire period of this Charter.


## 55. NOTICE OF READINESS CLAUSE

At every load port and discharge port, throughout the duration of this time charter, the Vessel shall tender her NOR immediately on arrival in the customary way. Until such time as the Vessel is all fast at the

*Chul*



berth/jetty, the Master shall re-tender vessel's NOR, daily, at 09:00 hours local time, to all parties as instructed in the Charterer's load/discharge orders.

The text of subsequent daily NOR, as above, shall be:

"Without prejudice to original NOR tendered ............... Hrs on..............19.... (to be completed as appropriate), on vessel's arrival, please be advised that my vessel is/remains ready in all respects to commence loading/discharging (delete as appropriate) of the cargo of .............. (complete as appropriate)".

## 56. QUESTIONNAIRES AND VESSEL'S DESCRIPTION

Completed Questionnaire-88 and OCIMF Vessel's Particulars Questionnaire, are incorporated in this Charter Party - see **Appendix No. 1.**
Owners shall promptly furnish the Charterers with copies of Vessel's General Arrangement plan, Cargo Capacity plan, Loading Scale, list of cargoes as per Certificate of Fitness (or equivalent), Suez and Panama Canal certificates, if requested.
Throughout the duration of this Charter Owners shall promptly attend to Charterers request(s) for provision of copies of other Vessel's certificates and completing of any other questionnaires as may be required by Charterers' trade.

## 57. COMPLIANCE WITH REGULATIONS / ELIGIBILITY

Owners warrant that the Vessel shall, at all times during this Charter, be in full compliance with all applicable international conventions, laws, regulations, and/or other requirements of the country of the vessel's registry and of the countries of the port(s) and/or place(s) to which the Vessel may be ordered hereunder, and all applicable regulations and/or requirements of any terminals or facilities in such port(s) or place(s) where the Vessel may load or discharge.

Owners further warrant that the Vessel shall have on board, during the charter, all certificates, records, or other documents required by the aforesaid conventions, laws, regulations, or requirements.

Without limitation, the conventions, laws, regulations and requirements referred to mean conventions, laws, regulations and requirements concerning ship size, ship design, safety, operation of ships equipment (including inert gas and crude oil washing systems, if the Vessel is so equipped) navigation, pollution and other like matters.

At the time of delivery and during the entire Charter period, the Vessel shall have on board an International Tonnage Certificate, or equivalent, and shall meet applicable guidelines published by OCIMF. ~~Without prejudice to any other term of this Charter, Charterers will have the right to withhold hire to the extent necessary to indemnify Charterers for any loss or delay arising from Owners' failure to comply with the requirements set out in this clause.~~

## 58. VESSEL CASUALTY INFORMATION

Owners warrant that Master shall inform Charterers without delay by telephone confirmed by fax/email if any situation occurs which results or is likely to result in either delays or damages to the Vessel or machine systems including, but not limited to, failure cargo, or pollution, or bunker fuel spill and/or discharge.

Incidents which result in failure or breakdown of Vessel's equipment (machinery, cargo handling etc) must be reported immediately to Charterers Operations Personnel.

Cacut



4

Major casualties such as collision, grounding, explosion, fire, pollution or threat of pollution must be immediately reported, with all information relating to the incident, such as date, location, description, consequences) to the Charterers' Hot line (to be advised ).

In case of an actual spill the following information will be required:
- date and time and location,
- quantity and product characteristics,
- weather conditions,
- resources at risk,
- steps taken to fight the pollution,
- confirmation whether the MARPOL Shipboard Oil Pollution Emergency Plan or the OPA 90 Vessel Response Plan has been activated.

In all cases, written confirmation of the casualty together with full details must be sent to: (to be advised )

Without prejudice to any other rights arising from any such casualty, any costs, losses, damages, expenses and/or delays suffered or incurred by Charterers because of Owners' negligence in failing to inform Charterers pursuant to the first paragraph of this clause shall be for Owners' account.

## 59. FAILURE/ CHANGE OF MANAGEMENT

Owners undertake that from the date of entering into this Charter the classification society, flag, ownership, management (whether technical or commercial) and P&I insurers of the Vessel shall not change without Charterers' prior consent. Without prejudice to any other remedy that Charterers may have, a breach of this provision will entitle Charterers to terminate this Charter whereupon Owners shall reimburse Charterers with any hire paid in advance and not earned.

Further, in the event of wilful misconduct and/or negligence by the vessel's managers or any situation resulting from the non-performance of technical and/or operational management whereby Charterers trade is curtailed or restricted shall also entitle Charterers without prejudice to any other terms of this Charter Party to terminate the Charter by service of notice of early redelivery to Owners.

## 60. VESSEL MAINTENANCE CLAUSE

Notwithstanding the content of clauses 1 and 2 above, upon reasonable notice, Owners to give to Charterers reasonable access to all documents regarding the Vessel whether aboard, ashore, in owner's or owners' management office.

Owners undertake to promptly provide charterers with all information regarding any modification altering vessel's original specifications made after the date of the Charter. Before each drydock, Owners will forward to Charterers a complete list of the works which are to be carried out. Immediately after drydock, Owners will forward to Charterers a new list confirming that all planed works have been effected and that there are no outstanding items left.

## 61. THIRD PARTY INSPECTION/VETTING

During the course of the present Charter, Owners warrant that they will maintain the trading ability of the Vessel in particular regarding vetting. To the best of owners knowledge upon delivery in Charter the Vessel is acceptable to the following major oil companies:

(company name)        (acceptable till)

5

~~~~
~~~~

~~Throughout the entire period of this Charter, Owners hereby undertake to maintain above acceptance status and promptly attend to Charterers' requests to have the vessel inspected/screened by any of the oil companies as may be required by Charterers' trade.~~

Owners shall advise Charterers immediately, in writing, should the vessel fail an inspection by, but not limited to, a government and/or port state authority and/or terminal and/or major Charterer. Owners shall simultaneously advise Charterers of their proposed course of action to remedy the defects which caused the failure of such inspection.

~~Should at any time the vessel become not acceptable to as minimum as 4 of the following major oil companies: Shell / Exmob / BP / TFE / Chevtex / Statoil / Agip, then Charterers may without prejudice to any other terms of this Charter terminate the Charter by service of notice of early redelivery to Owners.~~

### 62. ITF OR EQUIVALENT FOR VESSEL'S OFFICERS AND CREWS

Owners warrant that the vessel shall throughout the entire period duration of this Charter have on board:
- A crew which belongs to a Union recognized by and affiliated to ITF and
- An ITF certificate or equivalent allowing vessel's call and operations in all ports within the C/P trade where an ITF certificate is compulsory and required.

### 63. IGS- COW

Owners warrant that the Vessel is equipped with an inert gas system in good working order, which shall be operational during duration of this Charter. Owners also warrant that the master, officers and crew are competent to operate said system. In the event the master is required by terminal personnel or independent inspectors to breach the inert gas system for purpose of gauging, sampling, temperature determination or ascertaining remaining on board quantities after discharge, the master shall comply with these requirements consistent with safe operation of the vessel and regulations of the port. If the inert gas system is not in working condition due to the Vessel/Crew/Owners' negligence and is causing delay in the vessel's normal operation, the Vessel will be put off-hire for such time actually lost.

### 64. ASSIGNMENT / SALE

Owners shall not assign any of their rights or obligations under or in relation to this Charter without Charterers' prior written consent. Owners shall not sell the Vessel without Charterers' prior consent.

### 65. IN TRANSIT LOSS / CARGO RETENTION

Owners shall be responsible for any cargo in-transit loss exceeding ~~0.3~~ 0.5%, as determined by surveyor's figures. In-transit loss is defined as the difference between vessel's gross standard volume after loading at the loadport and before unloading at the discharge port, based on ship's figures. Calculation to be based at 60 Deg.F. Charterers are entitled to claim such losses from hire at an amount equivalent to the FOB load port value of such cargo, plus hire and bunkers in respect thereto.

In the event that any cargo remains onboard upon completion of discharge, as determined by an independent surveyor Charterers shall have the right to claim ~~deduct~~ from final hire an amount equal to the F.O.B. port of loading value of such cargo plus hire and bunkers in respect thereto provided that the volume of cargo remaining on board is liquid or would have been liquid but for the fault or negligence of

*Cheel~*



6